Daniel R. Watkins
Nevada State Bar No. 11881
DW@wl-llp.com
Theresa M. Santos
Nevada State Bar No. 9448
tsantos@wl-llp.com
WATKINS & LETOFSKY, LLP
8215 S. Eastern Ave., Ste. 265
Las Vegas, NV 89123
Office:(702) 901-7553; Fax: (702) 974-1297
Attorneys for Plaintiff, Kimberly Wilson

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| KIMBERLY WILSON,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>WILLIAMS-SONOMA DIRECT, INC., a foreign corporation; AND DOES 1-50, inclusive,<br><br>　　　　　Defendants. | Case No.:  2:19-cv-00395<br><br>**COMPLAINT FOR DAMAGES**<br><br>**(DEMAND FOR JURY TRIAL**) |

COMES NOW, Plaintiff, Kimberly Wilson (herein "PLAINTIFF") and files this civil action against Defendants, and each of them, for violations of The Americans with Disabilities Act, 42 U.S.C. §12101 et. seq., as well as violations under Nevada Revised Statutes §613.330 et. seq.; and related claims under Nevada law, seeking damages, and alleges as follows:

//
//
//
//
//
//

**COMPLAINT**
-1-

# JURISDICTION AND VENUE

1. This Court has jurisdiction and venue over this action pursuant to The Americans with Disabilities Act, 42 U.S.C. §12101 et seq., 42 U.S.C. §12111, and 28 U.S.C. § 1331, which confer original jurisdiction on federal district courts in suits to address the deprivation of rights, privileges and immunities secured by the United States Constitution and federal law.

2. Jurisdiction of this Court is also appropriate under any related claims under Nevada law.

3. Supplemental Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1367 over the State law claims which are so related to the federal claims in this action that they form part of the same case or controversy under Article III of the United States Constitution.

4. Plaintiff has exhausted his administrative remedies.

5. All conditions precedent to jurisdiction under section 42 U.S.C. §12101 et seq. have occurred or been complied with:

    a. A charge of employment discrimination was filed with the Equal Employment Opportunity Commission ("EEOC") within 180 days of the commission of the unlawful employment practice alleged herein and / or within 300 days of PLAINTIFF instituting proceedings with a State or local agency with authority to grant or seek relief from such unlawful employment practices alleged herein;

    b. A Notice of Right to Sue in Federal Court was received from the EEOC, dated December 7, 2018. (A true and correct copy of said letter is attached and incorporated herein as Exhibit "1".)

6. This complaint is filed within 90 days of receipt of the EEOC's Notification of Right to Sue.

7. Venue is proper in the District of Nevada because the unlawful employment practices alleged herein were committed in whole or in part in the District of Nevada pursuant to 28 U.S.C. § 1391(b).

//
//

## PARTIES

### PLAINTIFF

8. PLAINTIFF, KIMBERLY WILSON, was a qualified/eligible "employee" of DEFENDANT, within the meaning of 42 U.S.C. §12111 of the Americans with Disabilities Act, 42 U.S.C. §12101 *et seq.* and Nevada Revised Statutes §§ 608.010 and 613.010 *et seq.*; and related claims under Nevada law.

### DEFENDANTS

9. Defendant, WILLIAMS-SONOMA DIRECT, INC., (hereinafter "Williams-Sonoma" or "Defendant") is a foreign corporation qualified to do business in Nevada. Defendant employs 15 or more employees and is an "employer" within the meaning of 42 U.S.C. §12111.

10. The true names and capacities, whether individual, corporate, associate, or otherwise, of DOES 1 through 50, inclusive are unknown to Plaintiff at this time, who therefore sues said Defendants by such fictitious names. PLAINTIFF is informed and believes and thereon alleges that each of the fictitiously named DEFENDANTS are in some way responsible for, or participated in, or contributed to, the matters and things complained of herein, and is legally responsible in some manner. PLAINTIFF will seek leave to amend this Complaint when the true names, capacities, participation and responsibilities have been ascertained.

### STATEMENT OF FACTS

11. PLAINTIFF is a fifty-three year old female born on November 25, 1965. PLAINTIFF is a former employee of Defendant, where she worked as a service associate. At the time of her employment, PLAINTIFF'S pay consisted of an hourly wage of $11.22. She was employed by Defendant from October 17, 2016 to January 15, 2018.

12. Plaintiff was initially hired as a temporary employee.

13. Defendant offered PLAINTIFF a full-time position in January of 2017. Plaintiff was required to work on Sundays.

14. At the time of her termination from employment, PLAINTIFF was qualified for the position she held of service associate.

15. As a service associate, PLAINTIFF placed orders for customers over the telephone.

16. PLAINTIFF worked from her computer at home.

17. Pursuant to DEFENDANT'S attendance policy, service associates would receive one point for each absence. Employees who exceeded eleven disciplinary/attendance points in any 365-day period were terminated.

18. It was DEFENDANT'S policy to gift employees a free day off every quarter.

19. It was DEFENDANT'S policy to allow employees to designate one absence each quarter as an emergency occurrence ("EO").

20. From July 1, 2016 through July 1, 2017, PLAINTIFF accrued ten (10) attendance points.

21. PLAINTIFF was off of work from July 9, 2017 through August 12, 2017 for an FMLA-approved medical illness. PLAINTIFF did not accrue any attendance points for this absence.

22. PLAINTIFF was on bereavement leave from August 13, 2017 to August 15, 2017 due to her nephew's sudden death. PLAINTIFF did not accrue any attendance points for this absence.

23. PLAINTIFF returned to work on August 16, 2017 and learned she had a new supervisor, Michael Amos.

24. On or about September 10, 2017, PLAINTIFF clocked in to work but her computer did not allow her to take calls. Defendant's computer system automatically noted the inactivity, which reflected negatively on PLAINTIFF'S performance report as falling 'below expectations.' PLAINTIFF did not accrue any points for this inactivity.

25. PLAINTIFF notified her supervisor, Michael Amos, regarding the computer issue. Mr. Amos failed to make an adjustment to PLAINTIFF'S time card, thus PLAINTIFF received a written notice for poor productivity. PLAINTIFF was less than a percentage point from meeting her performance goal.

//

26. PLAINTIFF attended several company meetings and trainings between September 16, 2017 and September 18, 2017.

27. On or about September 21, 2017, PLAINTIFF noticed that Defendant's time program reflected that she was below the company's acceptable work hour percentage.

28. PLAINTIFF contacted supervisor Paul Wright, who was filling in for supervisor Michael Amos, and informed him than no adherence had been applied for her attendance at the meetings and training she attended from September 16-18, 2017.

29. Supervisor Paul Wright instructed PLAINTIFF to discuss the matter with supervisor Michael Amos.

30. PLAINTIFF discussed this issue with supervisor Michael Amos, as directed, but Mr. Amos never applied an adherence.

31. PLAINTIFF remained below the acceptable performance percentage and was written up.  Because Supervisor Michael Amos never applied an adherence for the absences PLAINTIFF incurred while attending company meetings and trainings, PLAINTIFF remained below the acceptable performance percentage and was written up.

32. On or about October 31, 2017, PLAINTIFF'S internet was down and her internet provider was unable to immediately resolve the issue.  Unable to complete her shift, Plaintiff accrued one-half attendance point, bringing her accrued point total to ten and one-half (10.5).

33. Because of the uncertainty with PLAINTIFF'S internet, Plaintiff requested permission from Michael Amos to work at the company's local headquarters the following day. Mr. Amos denied this request and, as a result, PLAINTIFF accrued another attendance point the next day, November 1, 2017, because her internet was still down and she was unable to work.

34. The added point assessed against PLAINTIFF on November 1, 2017 put her allowed absences at eleven and one-half (11.5) – one half point above the allowable point total. PLAINTIFF redeemed one emergency occurrence point to bring her absence total to ten and one-half (10.5) points.

35. When PLAINTIFF needed to take a break, she would log off of the Williams-Sonoma Citrix program and log back on when she returned.

36. Williams-Sonoma allowed service associates to take a break every three hours.

37. PLAINTIFF had surgery in May 2014 to remove fibroid tumors from her bladder. The side effects from this surgery left Plaintiff with a need to urinate more frequently.

38. Sometime during the fall of 2017, PLAINTIFF asked supervisor Paul Wright if the three hour requirement could be shortened due to the side effects she continued to experience from the 2014 surgery.

39. Supervisor Paul Wright, who was substituting for Mr. Amos, verbally approved a modified break schedule for PLAINTIFF.

40. On or about November 10, 2017, PLAINTIFF was assisting a customer when she experienced an uncontrollable urge to urinate.

41. PLAINTIFF completed the customer's order, but in her haste to use the bathroom, she forgot to log off of her computer. PLAINTIFF was unable to make it to the bathroom in time and urinated in her clothing. By the time PLAINTIFF cleaned herself and changed clothing, approximately twenty minutes had elapsed. PLAINTIFF notified supervisor Paul Wright for an adherence to her time card, waiving the 20-minute gap in work activity.

42. Supervisor Paul Wright granted this adherence request.

43. Not long after the incident on November 10, 2017, Michael Amos returned from leave and assumed his supervisor duties.

44. Shortly after his return in November, 2017, Michael Amos sent an email to all sales associates stating that frequent restroom visits were not an allowable reason to have adherences made.

45. By November 27, 2017, 2.5 of Plaintiff's accrued absence points had been dropped because they were over a year old. This left Plaintiff with eight (8.0) absence points.

46. PLAINTIFF was off work for the five-day period November 27, 2017 through December 4, 2017 for medical related issues. PLAINTIFF returned to work on December 5, 2017, with a doctor's note. Because PLAINTIFF had a physician's note, she only accumulated 1 point for the first three days missed. She accumulated one point per day for the remaining two

days. In total, PLAINTIFF accrued three absence points from this illness, bringing PLAINTIFF'S accrued point total to eleven (11.0).

47. PLAINTIFF attended her son's military graduation on December 20, 2017 and accrued one attendance point, bringing her accrued absences to twelve points (12.0).

48. PLAINTIFF utilized an emergency occurrence point ("EO") that she had acquired on October 1, 2018, which reduced her absences to eleven (11.0).

49. PLAINTIFF applied to work overtime on December 22, 2017.

50. DEFENDANT approved PLAINTIFF'S overtime request and PLAINTIFF worked six hours of overtime on December 22, 2017.

51. Shortly thereafter, PLAINTIFF discovered that DEFENDANT had marked her as absent on December 22, 2017 and assessed her one attendance point. This placed PLAINTIFF'S accrued absence total at twelve (12.0) points, thus exceeding the maximum allowable absences.

52. PLAINTIFF immediately notified supervisor Paul Wright of this error.

53. On January 1, 2018, DEFENDANT invited employees to take voluntary time off ("VTO".) Plaintiff volunteered to take the day off. DEFENDANT approved Plaintiff's request.

54. When PLAINTIFF clocked in the next day, she discovered that she had accrued another absence point, leaving her with an accrued absence total of thirteen (13.0) points.

55. On or about January 2, 2018, PLAINTIFF brought the errors from December 22, 2017 and January 1, 2018 to the attention of her new supervisor, Paul Littlejohn.

56. Paul Littlejohn never responded to PLAINTIFF'S request for assistance in clarifying her absences.

57. On January 8, 2018, PLAINTIFF began working as scheduled. However, Plaintiff forgot to log back in after lunch and as a result, accrued one-half absence point, bringing her accrued absence total to thirteen and on-half (13.5) points.

58. PLAINTIFF immediately informed her supervisor, Paul Littlejohn of her error and requested that he fix it. Mr. Littlejohn never responded to PLAINTIFF'S request.

59. PLAINTIFF followed up with Mr. Littlejohn on January 9, 2018. Mr. Littlejohn responded to PLAINTIFF that he had not heard back from human resources.

60. Thirty minutes later, on January 9, 2018, Mr. Littlejohn called PLAINTIFF and informed her that her employment was terminated, effective immediately, because she had accrued too many absences.

61. PLAINTIFF is a member of the Church of Jesus Christ of Latter Day Saints.

62. PLAINTIFF questioned Defendant about having Sundays off so that she could attend religious services.

63. DEFENDANT informed PLAINTIFF that she had to wait ninety (90) days before she could request a schedule change.

64. In April, 2017, Plaintiff requested Sundays off so that she could attend religious services.

65. DEFENDANT denied Plaintiff's request.

66. In September 2017, PLAINTIFF again requested Sundays off so that she could attend religious services.

67. DEFENDANT denied PLAINTIFF'S September 2017 request.

68. In January, 2018, PLAINTIFF requested Sundays off so that she could attend religious services.

69. DEFENDANT never responded to PLAINTIFF'S January 2018 request.

70. Not only did DEFENDANT deny or ignore PLAINTIFF'S requests for time off to attend religious services, DEFENDANT never offered to accommodate PLAINTIFF'S Sunday work schedule so that she could attend religious services.

## COUNT I

### DISABILITY DISCRIMINATION – FAILURE TO ACCOMMODATE

**Americans with Disabilities Act (42 U.S.C. §12101 et seq.)**

**NV Rev. Stat. §613.330** *et seq.*

71. PLAINTIFF hereby incorporates paragraphs 1 through 70 of this Complaint as though fully set forth herein.

72. The Americans with Disabilities Act, 42 U.S.C. §12101, *et. seq.* prohibits employers from discriminating against qualified individuals because of a disability "in regard to

job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." (42 U.S.C. §12112).

73. PLAINTIFF had a disability within the meaning of the Americans with Disabilities Act ("ADA"). A "disability" under the ADA is a physical or mental impairment or being regarded as having a physical or mental impairment that substantially limits one or more of the major life activities of such individual. The terms disability and physical or mental impairment include (1) any physiological disorder, or condition affecting one or more of the following body systems: neurological, musculoskeletal, and others; or (2) any mental or psychological disorder such as emotional or mental illnesses, among others.

74. PLAINTIFF was a qualified individual, meaning an individual with a disability who, with or without a reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. At all times during her employment, PLAINTIFF satisfied the requisite skill, experience, education and other job-related requirements of the employment position and could perform the essential functions of the position, with or without reasonable accommodations.

75. Specifically, PLAINTIFF'S urinary incontinence, a side effect of uterine fibroid surgery in 2014, necessitated that PLAINTIFF use the restroom more frequently than once every three hours, as per DEFENDANT'S policy.

76. Due to her actual and/or perceived disability under the ADA, PLAINTIFF required a reasonable accommodation to assist her with fulfilling her employment obligations. Such reasonable accommodations were available and would not have constituted an undue hardship on the operation of DEFENDANT'S business.

77. PLAINTIFF'S disability was a factor that made a difference in DEFENDANTS' decision to refuse to allow her breaks to use the restroom.

78. PLAINTIFF'S disability, and/or record of a disability, and/or perceived disability was a factor that made a difference in DEFENDANTS' decision to terminate her.

//

79. DEFENDANT never engaged in the interactive process with PLAINTIFF to evaluate and determine whether or to what degree she needed additional accommodations.

80. The actions of DEFENDANT were malicious, intentional and willful, in deliberate disregard of and with reckless indifference to the rights and sensibilities of PLAINTIFF.

81. As a direct and proximate result of DEFENDANT'S violation of PLAINTIFF'S rights as alleged, PLAINTIFF'S terms, conditions, and privileges of employment were adversely affected.

82. As a direct and proximate result of DEFENDANT'S wrongful acts and omissions, PLAINTIFF has sustained injuries and damages including but not limited to, loss of earnings and earning capacity; loss of career opportunities; loss of fringe benefits; mental anguish, physical and emotional distress; humiliation and embarrassment; loss of the ordinary pleasures of everyday life, including the right to pursue the gainful employment of her choice.

83. PLAINTIFF requests relief as described in the Prayer for Relief below.

## COUNT II

## INTERFERENCE AND DISCRIMINATION WITH AMERICANS WITH DISABILITIES ACT

**Americans with Disabilities Act (42 U.S.C. §12101 et seq.)**

**(Against All Defendants)**

84. PLAINTIFF hereby incorporates paragraphs 1 through 83 of this Complaint as though fully set forth herein.

85. The Americans with Disabilities Act, 42 U.S.C. §12101, *et. seq.* prohibits employers from discriminating against qualified individuals because of a disability "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." (42 U.S.C. §12112.)

//

86. PLAINTIFF had a disability within the meaning of the Americans with Disabilities Act ("ADA"). A "disability" under the ADA is a physical or mental impairment or being regarded as having a physical or mental impairment that substantially limits one or more of the major life activities of such individual. The terms disability and physical or mental impairment include (1) any physiological disorder, or condition affecting one or more of the following body systems:  neurological, musculoskeletal, and others; or (2) any mental or psychological disorder such as emotional or mental illnesses, among others.

87. PLAINTIFF was a qualified individual, meaning an individual with a disability who, with or without a reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. At all times during her employment, PLAINTIFF satisfied the requisite skill, experience, education and other job-related requirements of the employment position and could perform the essential functions of the position, with or without reasonable accommodations.

88. PLAINTIFF was covered by the Americans with Disabilities Act. Specifically, PLAINTIFF'S frequent need to urinate inhibited PLAINTIFF in the major life activities of, inter alia, using the restroom only once every three hours.

89. Due to her actual disability under the ADA, PLAINTIFF required a reasonable accommodation to assist her with fulfilling her employment obligations. Such reasonable accommodations were available and would not have constituted an undue hardship on the operation of DEFENDANT'S business.

90. DEFENDANT refused to accommodate PLAINTIFF.

91. DEFENDANT'S refusal to accommodate PLAINTIFF and ultimate termination of her employment constituted unwelcome interference, coercion and/or intimidation. .

92. DEFENDANT'S interference, coercion and/or intimidation was rooted in PLAINTIFF'S disability.

93. DEFENDANT'S interference, coercion and/or intimidation was sufficiently severe or pervasive to alter the terms, conditions and/or privileges of employment.

94. DEFENDANT knew or should have known of the interference, coercion and/or intimidation and failed to take prompt, remedial action.

95. DEFENDANT, through its agents or supervisors, failed to adequately supervise, control, discipline, and/or otherwise penalize the conduct, acts and failures to act of DEFENDANT as described above, thereby ratifying the unlawful conduct of its agents or supervisors.

96. PLAINTIFF'S disability was either the sole reason or a substantial motivating factor for DEFENDANT'S decision to adversely affect her employment and ultimately discharge her.

97. DEFENDANT'S actions were intentional, willful, malicious and/or done with reckless disregard for PLAINTIFF'S federally protected rights.

98. As a proximate result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

99. PLAINTIFF requests relief as described in the Prayer for Relief below.

## COUNT III

## RELIGIOUS DISCRIMINATION

**Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. 2000(e)(j)**

**NV Rev. Stat. §613.330 et seq.**

**(Against All Defendants)**

100. PLAINTIFF hereby incorporates paragraphs 1 through 99 of this Complaint as though fully set forth herein.

101. Title VII of the Civil Rights Act of 1964, as amended 42 U.S. C. 2000(e), *et. seq.* prohibits employers from discriminating against qualified individuals because of a their religion.

102. The term "religion" includes "all aspects of religious observance and practice, as well as belief." 42 U.S.C. §2000e(j).

103. PLAINTIFF is a member of the Church of Jesus Christ of Latter Day Saints.

104. The Church of Jesus Christ of Latter Day Saints (hereinafter "LDS") is an established religion in the United States. LDS members observe religious services on Sundays. At all times alleged in the Complaint, LDS services lasted three hours. Members were expected to attend all three hours to be considered active members of the faith.

105. Allowing PLAINTIFF time off on Sundays to attend services would not have caused Defendant any hardship.

106. Defendant allows non-LDS members to break from work to attend their religious services. Likewise, DEFENDANT could have allowed PLAINTIFF to break from work to allow her to attend services.

107. DEFENDANT refused to accommodate PLAINTIFF'S religion and religious practices and refused to allow her to take time off on Sundays to attend religious services.

108. DEFENDANT'S unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

109. As a proximate result of DEFENDANT'S discriminatory actions, PLAINTIFF has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress. As a result of those actions and consequent harms, PLAINTIFF has suffered such damages in an amount to be proven at trial.

110. PLAINTIFF requests relief as described in the Prayer for Relief below.

## COUNT IV

## RELIGIOUS DISCRIMINATION – FAILURE TO ACCOMMODATE

**Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. §2000(e)(j)**

**NV Rev. Stat. §613.330** *et seq.*

**(Against All Defendants)**

111. PLAINTIFF hereby incorporates paragraphs 1 through 109 of this Complaint as though fully set forth herein.

112. DEFENDANT'S conduct as herein alleged violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e(j), which requires an employer to accommodate religious practices and beliefs.

113. DEFENDANT acted in violation of Title VII when, rather than initiating steps toward accommodating his religious practice, Defendant ignored Plaintiff's request for Sundays off.

114. Accommodating PLAINTIFF'S religious practice would not have caused DEFENDANT an undue hardship.

115. As a proximate result of DEFENDANT'S discriminatory actions, PLAINTIFF has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

116. PLAINTIFF requests relief as described in the Prayer for Relief below.

## **PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFF prays that this Court grant the following relief:

A. Economic Loss for Back Pay and Front Pay, plus prejudgment interest;

B. Compensatory Damages in accordance with 42 U.S.C. §12117; 42 U.S.C. §1981a(a)(3), and other applicable statutes;

C. Reasonable attorneys' fees pursuant to 42 U.S.C. §12205 and other applicable statutes;

D. Punitive Damages in accordance with 42 U.S.C. §12117; 42 U.S.C. §1981a(a)(3), and other applicable statutes;

E. Costs of suit incurred herein; and

F. Such other and further relief as the court deems just and proper.

DATED this 6th day of March 2019.        WATKINS & LETOFSKY, LLP

*/s/ Daniel R. Watkins*
By: _____
Daniel R. Watkins
Theresa M. Santos
8215 S. Eastern Ave., Ste. 265
Las Vegas, NV 89123
Attorneys for Plaintiff, Kimberly Wilson

**REQUEST FOR JURY TRIAL**

Pursuant to Federal Rules of Civil Procedure 38(b) and 42 U.S.C. §1981a, PLAINTIFF demands a trial by jury in this action on all issues so triable.

DATED this 6th day of March 2019.    WATKINS & LETOFSKY, LLP

By: */s/ Daniel R. Watkins*
_____
Daniel R. Watkins
Theresa M. Santos
8215 S. Eastern Ave., Ste. 265
Las Vegas, NV 89123
Attorneys for Plaintiff, Kimberly Wilson